UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JACQUELINE WYKA MAHAJAN, individually
and on behalf of all others similarly situated,

                Plaintiff,                  16-cv-6944 (PKC)

     -against-                     MEMORANDUM
                                 AND ORDER


BLUE CROSS BLUE SHIELD ASSOCIATION,

                Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Invoking the Court's diversity jurisdiction, Jacqueline Mahajan brings this action

on behalf of herself and all others similarly situated asserting state law claims for deceptive

advertising, fraud, and negligent misrepresentation.  Specifically, plaintiff alleges that defendant

Blue Cross Blue Shield Association misrepresented the scope of its preferred provider network

and the availability of in-network certified lactation consultants inducing her to enroll in

defendant's health benefits plan and suffer damages.

        Defendant moves to dismiss the amended complaint (Dkt. 23) under Rules

12(b)(1) and 12(b)(6), Fed. R. Civ. P.  (Dkt. 31.)  Because the Court concludes that plaintiff's

claims are preempted by the Federal Employees Health Benefits Act, 5 U.S.C. § 8901 et seq.

("FEHBA"), both expressly and under the doctrine of conflict preemption, the motion to dismiss

will be granted.

STATUTORY BACKGROUND

        FEHBA directs the United States Office of Personnel Management ("OPM") to

establish and regulate health benefits plans for the federal workforce.  See 5 U.S.C. §§ 8902(a),

8913(a).  Pursuant to its authority under FEHBA, OPM contracted with defendant Blue Cross Blue Shield Association to create a Service Benefit Plan for federal employees.  FEHBA provides that any contract under the statute "shall contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits as [OPM] considers necessary or desirable."  5 U.S.C. § 8902(d).  FEHBA also directs that each plan participant receive a statement of benefits, sometimes referred to as a plan brochure, containing an official description of the plan's terms.  See 5 U.S.C. § 8907(b).  That brochure is specifically authorized for distribution by OPM.  (See, e.g., 2011 Plan Brochure, Compl. Ex. A ("2011 Plan Brochure") (cover page stating "Authorized for distribution by the: United States Office of Personnel Management").)

OPM has broad authority to "promulgate regulations to enforce the statutory scheme" and police the conduct of FEHBA insurance carriers.  Botsford v. Blue Cross & Blue Shield of Montana, Inc., 314 F.3d 390, 395 (9th Cir. 2002), opinion amended on denial of reh'g, 319 F.3d 1078 (9th Cir. 2003); 5 U.S.C. §§ 8901-8913.  For example, OPM regulations authorize it to ensure that carrier's marketing and informational materials are truthful and not misleading and to punish any carrier who fails to comply with OPM advertising guidelines.  See 48 C.F.R. § 1652.203-70 (requiring that all contracts between OPM and insurance carriers include a clause prohibiting carriers from disseminating false or misleading materials and listing corrective and punitive actions OPM may take against non-compliant carriers).

As the Supreme Court observed, "FEHBA concerns benefits from a federal health insurance plan for federal employees that arise from a federal law in an area with a long history of federal involvement."  Coventry Health Care of Missouri, Inc. v. Nevils, 137 S.Ct. 1190, 1197 (2017) ("Coventry") (citations and quotation marks omitted).  Given FEHBA's statutory context

and purpose, the Court has recognized that "[s]trong and 'distinctly federal interests are involved' . . . in uniform administration of the program, free from state interference, particularly in regard to coverage, benefits, and payments."  Id. (quoting Empire HealthChoice Assur., Inc. v. McVeigh, 547 U.S. 677, 696 (2006) ("McVeigh II")).

THE FACTS ALLEGED

> The following factual allegations are taken from the amended complaint and the exhibits attached thereto and are accepted as true for purposes of defendant's motion.[1]  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  All reasonable inferences are drawn in favor of the plaintiff as the non-movant.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

> Beginning in 2009, plaintiff and her family were enrolled in the defendant's Service Benefit Plan (the "Plan").  (Compl. ¶ 6.)  According to the amended complaint, the Plan is a "fee-for-service plan that offers services through a Preferred Provider Organization ('PPO')" also referred to as a "preferred provider network."  (Id. ¶¶ 8, 36.)

> The Plan offers two insurance options, the Basic Option and the Standard Option.  (Id. ¶ 9.)  Under both options, participants pay less for services when they use health care providers who are members of defendant's PPO, also referred to as "preferred providers."  (Id. ¶¶ 8-10.)  Under the Basic Option, plan participants must visit a preferred provider in order to receive benefits under the Plan.  (Id. ¶ 9.)  The cost of any care provided by a non-preferred

---

[1] The amended complaint specifically references documents related to the insurance plan at issue and also includes several exhibits including excerpts from those documents, newspaper articles, and congressional testimony.  (See Compl. Exs. A-F.)  The Court may consider exhibits or documents incorporated by reference without converting the motion into one for summary judgment.  See Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006).  "'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

provider must be paid entirely by the plan participant.  (Id.)  Under the Standard Option, plan participants may visit both preferred providers and non-preferred providers but they pay less for care when they visit a preferred provider.  (Id. ¶ 10.)

Lactation consultants are defined in the complaint as "health care professionals who specialize in the clinical management of breastfeeding" and provide breastfeeding training, counseling and support during pregnancy and after birth.  (Id. ¶¶ 14-25.)  The amended complaint alleges that "[a]s of November 2012, there were approximately 13,292 certified lactation consultants in the United States."  (Id. ¶ 26.)

Plaintiff claims that under section 2713 of the Public Health Service Act, 42 U.S.C. § 300gg-13, the defendant was required to provide plan participants with coverage for certain preventative services and screenings, including lactation support during pregnancy and following birth.[2]  (Compl. ¶¶ 11-12.)  In addition, plaintiff claims that under the statute defendant was prohibited from imposing any cost sharing mechanism for these services, such as a copayment, coinsurance or deductible, as long as the service was provided by a preferred provider.  (Id. ¶ 13.)

Defendant disputes plaintiff's interpretation of its obligations under the statute.  It contends that "the [statute's] prohibition against imposing cost-sharing applies regardless of whether the insured uses an in-network or out-of-network provider."  (Def.'s Mem. at 8.)  According to defendant, section 2713 does not require the Plan to offer these preventative services through in-network providers.  (Id.)  Rather, if the defendant does not have an in-network provider who can provide these services, section 2713 requires a health benefit plan, in

_____

[2] Plaintiff erroneously cites to section 2713 of the Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), which amended the Public Health Service Act.  The Court assumes that the provision cited in the text is the provision plaintiff intended to cite.

this case defendant's plans (both the Basic Option and the Standard Option), to cover the services provided by an out-of-network provider, without imposing cost-sharing on the insured. (Id. (citing 29 C.F.R. § 2590.715-2713(a)(3)(ii).)  The precise requirements of section 2713 are ultimately immaterial to the Court's analysis.

Plaintiff alleges that due to the requirements of the ACA, as of January 1, 2011 certified lactation consultants were included for the first time as "covered professional providers" under the Plan.[3]  (Compl. ¶ 29).  In addition, plaintiff claims that OPM required defendant to provide insurance benefits for "[b]reastfeeding education and individual coaching on breastfeeding by a physician, physician assistant, nurse midwife, nurse practitioner/clinical specialist, or registered nurse certified lactation consultant."  (Id. ¶ 30.)  The Plan Brochure also informed participants that "this Plan must provide preventative services and screenings to you without any cost sharing when the services are performed by a Preferred provider."  (Id. ¶ 31 (citing 2011 Plan Brochure at 7).)

The amended complaint alleges that beginning in 2010, defendant engaged in a scheme to "circumvent the mandate of the ACA and its obligations under the Service Benefit Plan by excluding lactation consultants from its preferred and participating provider network." (Id. ¶ 32.)  Specifically, plaintiff alleges that at all relevant times, defendant's preferred provider network did not include any certified lactation consultants anywhere in the United States, or alternatively, none in the New York/New Jersey region where plaintiff lived.  (Id. ¶¶ 2, 33-34.) As part of its scheme, plaintiff alleges that defendant made "materially misleading and deceptive

---

[3] "Covered professional providers" may be in or out-of-network providers.  (See 2011 Plan Brochure at 12-16.) Participants in the Basic Option only receive benefits if they visit a covered professional provider who is also part of the preferred provider network.  (Id.)  Participants in the Standard Option may visit any covered professional provider but pay less for care when they visit a covered professional provider who is also a member of the preferred, participating or member networks.  (Id.)

statements in Plan documents and otherwise to conceal its misconduct and increase Plan subscriptions, renewals, and the profits it realized therefrom." (Id. ¶ 35.)

The amended complaint alleges that defendant "misled insureds and prospective insureds concerning its preferred/participating provider network and the actual cost to insureds for breastfeeding education and support." (Id. ¶ 46.) For example, plaintiff claims that defendant represented that the costs of receiving lactation support would be either entirely covered by the Plan or reduced if they used a preferred provider. (See, e.g., id. ¶¶ 39, 41-43.) Plaintiff claims that these statements were misleading because it was impossible for plan participants to take advantage of these cost savings due to the fact that defendant's preferred provider network did not include any certified lactation consultants. (See, e.g., id. ¶ 43.)

Plaintiff also claims that defendant repeatedly misrepresented the scope of its preferred provider network. For example, plaintiff cites the following allegedly deceptive statements:

- The 2011 Plan Brochure indicated that "PPO networks may be more extensive in some areas than in others. We cannot guarantee the availability of every specialty in all areas." (Id. ¶ 40 (citing 2011 Plan Brochure at 7).)[4] Plaintiff claims that this statement was misleading because defendant's network of certified lactation consultants "was not 'more extensive in some areas than in others,' but rather non-existent in all areas." (Id.)

- The 2011 Plan Brochure indicated that "PPO providers are available in most locations," however, plaintiff contends that "[f]ar from being 'available in most locations,' preferred lactation providers were not available anywhere in the continental United States." (Id. ¶ 44 (citing 2011 Plan Brochure at 143).)

[4] Plaintiff asserts that the alleged misrepresentations in the 2011 Plan Brochure were "repeated in each Plan Brochure from 2011 to the present." (Compl. ¶ 46.)

- In 2013, defendant allegedly advertised "[o]ur Preferred provider network . . . is almost one million strong, so you can find a network provider near where you live and nationwide." (Id. ¶ 47.) Plaintiff claims this advertisement was "false and misleading . . . because its PPO did not include any lactation consultants 'near where you live and nationwide.'" (Id. ¶ 48.)

- In April 2013, defendant's Vice President, Government Programs, allegedly testified to Congress that its "nationwide plans provide access to in-network providers anywhere in the country." (Id. ¶ 50 (quoting Compl. Ex. B).) Plaintiff claims this statement was misleading because there were no in-network lactation consultants anywhere in the country. (See id. ¶ 51.)

- In July 2015, a representative of defendant reportedly told the Chicago Tribune that defendant "makes every effort to ensure that we abide by the rules and regulations outlined in the ACA." (Id. ¶ 52 (quoting Compl. Ex. D).) Plaintiff claims this statement was false and misleading because defendant's scheme was actually a "willful and . . . brazen attempt to circumvent its obligations under the ACA." (Id. ¶ 54.) According to plaintiff, "[b]ecause the ACA's prohibition against imposing cost-sharing on insureds is triggered only when services are delivered by a network provider, Defendant decided to simply exclude certified lactation consultants from its network" and also "charged insureds co-payments when they were forced to utilize out-of-network lactation providers." (Id.)

- In another statement in the same article, the representative allegedly stated that "breast-feeding benefits are covered when provided by doctors, nurses and breast-feeding specialists in policyholders' provider networks." (Id. at ¶ 52 (quoting Compl. Ex. D).)

Plaintiff claims this statement was misleading because it failed to "adequately inform insureds that any such services are available only while in-patient on a maternity ward" because doctors and nurses are unavailable for out-patient services. (Id. ¶ 53.)

According to the amended complaint, these alleged misrepresentations "had the effect of concealing [defendant's] non-compliance with the [ACA] from the federal government, insureds and prospective insureds[,] . . . increasing insurance subscriptions and renewals by fraudulently making the Plan appear more attractive than other insurance options" and "fraudulently boosting its profit and OPM's profit analysis factors." (Id. ¶ 55.)

Plaintiff also claims she incurred out-of-pocket losses as a result of defendant's misrepresentations. At some point while insured under the Service Benefit Plan, plaintiff paid money "from her own bank accounts to fund visits with lactation consultants" – services she alleges "[d]efendant was required to provide to [her] for nothing." (See id. ¶ 68.) Plaintiff claims damages for the costs of infant formula, which she would not have incurred had she been able to breastfeed her child, lost investment income on the money she paid for visits to out-of-network lactation consultants, and the costs of treatment for emotional distress including "stress, anxiety, anger and frustration." (See id.)

Plaintiff brings four state law causes of action, all based on defendant's alleged misrepresentations regarding the availability of in-network lactation consultants and the payments required for those services. Plaintiff's first and second causes of action allege deceptive business practices and misrepresentations in violation of the New York General Business Law, N.Y. GEN. BUS. L. §§ 349, 350, and the New Jersey Consumer Fraud Act, N.J. STAT. ANN. § 56:8-2. (Id. ¶¶ 64-72.) The third cause of action alleges that defendant's misrepresentations fraudulently induced plaintiff to purchase insurance under the Service Benefit

Plan, (Id. ¶¶ 73-77), while the fourth cause of action alleges negligent misrepresentation, (Id. ¶¶ 78-82).

Defendant moves to dismiss the amended complaint on several grounds, including that plaintiff's claims are preempted by FEHBA.

DISCUSSION

I.    Legal Standard.

Defendant moves to dismiss plaintiff's claims under Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action," are not entitled to any presumption of truth. Id.

II.    Preemption.

The Constitution's Supremacy Clause, Article VI, Clause 2, provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitutions or Laws of any State to the Contrary notwithstanding." Since Gibbons v. Ogden, 22 U.S. 1 (1824), it has been understood that "[a] fundamental principle of the Constitution is that Congress has

the power to preempt state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372

(2000). Courts recognize three categories of federal preemption:

> (1) express preemption, where Congress has expressly preempted
> local law; (2) field preemption, 'where Congress has legislated so
> comprehensively that federal law occupies an entire field of
> regulation and leaves no room for state law'; and (3) conflict
> preemption, where local law conflicts with federal law such that it
> is impossible for a party to comply with both or the local law is an
> obstacle to the achievement of federal objectives.

New York SMSA Ltd. Partnership v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010) (per

curiam) (quoting Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 313 (2d Cir. 2005)). "By their

nature, field preemption and conflict preemption are usually found based on implied

manifestations of congressional intent." Id.

In application, these categories may be overlapping or complementary. See, e.g.,

Sprietsma v. Mercury Marine, 537 U.S. 51, 65 (2002). For example, "Congress' inclusion of an

express pre-emption clause does *not* bar the ordinary working of conflict pre-emption principles,

. . . that find implied pre-emption where it is impossible for a private party to comply with both

state and federal requirements, or where state law stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress." Id. (internal citations and

quotation marks omitted).

> a. Express Preemption.

FEHBA contains the following express preemption provision:

> The terms of any contract under this chapter which relate to the
> nature, provision, or extent of coverage or benefits (including
> payments with respect to benefits) shall supersede and preempt any
> State or local law, or any regulation issued thereunder, which
> relates to health insurance or plans.

5 U.S.C. § 8902(m)(1). Thus, "[t]wo independent conditions must be satisfied in order to trigger

preemption under § 8902(m)(1)." Empire HealthChoice Assur., Inc. v. McVeigh, 396 F.3d 136,

145 (2d Cir. 2005) ("McVeigh I"). First, the FEHBA contract terms at issue must "relate to the nature, provision, or extent of coverage or benefits." Id. (quoting 5 U.S.C. § 8902(m)(1)). Second, the state laws at issue must "relate[] to health insurance or plans." Id. (quoting 5 U.S.C. § 8902(m)(1)).

### i. First Condition of Preemption.

Defendant asserts that plaintiff's claims satisfy both conditions of express preemption. Plaintiff disagrees, claiming the first condition is not met because the terms of the contract between OPM and the defendant are "completely irrelevant" to her claims. (Pl.'s Mem. at 16.) Instead, she asserts she is only challenging statements made in materials marketing the Plan, primarily the Statement of Benefits or Plan Brochure. This Court concludes that plaintiff reads her own complaint too narrowly and that her claim is entirely dependent on the benefits, the description of the benefits and the brochures which describe the benefits, which are dictated by the FEHBA-compliant contract between OPM and defendant.

The contract between OPM and the defendant provides that OPM and defendant "shall agree upon language setting forth the benefits, exclusions and other language of the Plan" and that the Plan Brochure will consist of this agreed upon text in a format approved by OPM. (2008 Master Contract § 1.13(a), Def.'s Mem. Ex. A ("2008 Master Contract"); 2013 Master Contract § 1.13(a), Def.'s Mem. Ex. B ("2013 Master Contract").)[5] The contract also requires defendant to reproduce this agreed upon language in the Plan Brochure "verbatim." (2008 Master Contract § 1.13(c); 2013 Master Contract § 1.13(c).) Far from being "completely

---

[5] The amended complaint alleges that defendant's Service Benefit Plan is a "qualified plan under the Federal Employees Health Benefits Program, as established by [FEHBA]." (Compl. ¶ 7.) The contract between OPM and the defendant pursuant to FEHBA is what makes the Service Benefit Plan a FEHBA health plan. Thus, the Court may consider the Master Contract on the motion to dismiss as it is integral to the complaint. See DiFolco, 622 F.3d at 111. Plaintiff does not argue otherwise and in fact quotes the Master Contract in her opposition brief. (See, e.g., Pl.'s Mem. at 2, 23-24.)

irrelevant," these contract terms are directly implicated by plaintiff's claims which challenge the contractually-mandated language in the Plan Brochure.

In addition, these provisions "relate to the nature, provision, or extent of coverage or benefits." 5 U.S.C. § 8902(m)(1). The phrase "relate to" as it is used in FEHBA's preemption provision "expresses a broad pre-emptive purpose," and is "notably expansive in sweep." Coventry, 137 S.Ct. at 1197 (internal quotation marks and alterations omitted). Section 1.13 of the Master Contract governs the language of the Plan Brochure which lays out in detail the nature and extent of the benefits and coverage provided under the Plan. (See 2008 Master Contract § 1.13(a), (c); 2013 Master Contract § 1.13(a), (c).) It also sets out the ways in which plan participants will receive critical information about the benefits provided by the Plan. (See 2008 Master Contract § 1.13(a) (providing that defendant must distribute the Plan Brochure to all plan participants on a timely basis and to Federal agencies so that the Plan Brochure will be available to those eligible to enroll in the Plan); 2013 Master Contract § 1.13(a) (same).) Finally, in setting out the benefits defendant is obligated to provide to plan participants, the contract states the defendant "shall provide the benefits as described in the agreed upon brochure text." (See 2008 Master Contract § 2.2(a); 2013 Master Contract § 2.2(a).)

Thus, the first condition of FEHBA's preemption provision is satisfied.

ii. Second Condition of Preemption.

Defendant contends that the second condition of preemption is also met because in this context, the state fraud, misrepresentation and deceptive business practice laws of New York and New Jersey have a direct and necessary impact on health benefits plans. In response, plaintiff argues that because these laws do not specifically reference health insurance or health

benefits plans, they cannot "relate[] to health insurance or plans " as required by FEHBA's preemption provision.  5 U.S.C. § 8902(m)(1).

Whether the second prong of FEHBA preemption applies to plaintiff's state law claims turns on the recent decision in Coventry, 137 S.Ct. 1190, and an earlier decision in McVeigh II, 547 U.S. 677.  These two decisions, authored for the majority by Justice Ginsburg, point to the conclusion that language in the Second Circuit's earlier McVeigh I decision was dictum.  McVeigh I, 396 F. 3d 136.  Coventry also supports the conclusion that a state's common law principles, not limited in their application to "health insurance or plans," may satisfy the second prong of the FEHBA preemption test.

In McVeigh I, the Second Circuit analyzed FEHBA's preemption provision in order to determine whether that provision conferred federal subject matter jurisdiction on district courts to hear a claim brought by an insurance carrier.  McVeigh I, 396 F.3d at 145.  Writing for a divided panel in which Judge Sack concurred and Judge Raggi dissented, then-Judge Sotomayor concluded that the FEHBA preemption provision did not itself confer subject matter jurisdiction and that defendant's breach of contract reimbursement claims arose out of state law, thus precluding the district court from exercising jurisdiction over the case.  See id. at 149-150.  In so concluding, Judge Sotomayor wrote:

> If Congress intended for this case to be heard in federal court, it could have created a private right of action for suits against FHEBA beneficiaries; it could have vested jurisdiction over these claims in the federal courts; or it could have included an affirmative grant of authority to the federal courts to create a body of federal common law.  Congress did none of those things.

Id. at 150.  Therefore, the Court affirmed the district court's ruling that it lacked subject matter jurisdiction.  Id.

In her dissent, Judge Raggi argued that section 8902(m)(1) did confer federal jurisdiction because it authorized courts to employ federal common law to disputes regarding coverage and benefits.  See McVeigh I, 396 F.3d at 155-56 (Raggi, J. dissenting).  She maintained that the second clause of the preemption provision encompassed laws of general application that do not expressly or specifically regulate health insurance or plans but are used to construe or enforce FEHBA plans in a given case.  Id. at 157-58 (Raggi, J. dissenting).  The panel majority rejected this view for the following reason:

> [E]*very* state or local law applied to a dispute satisfying the first condition [of preemption] (that is, every state law applied to a dispute involving a contract term relating to coverage or benefits) will ipso facto affect the construction or enforcement of that term.  Thus, under the dissent's reasoning, FEHBA contract terms will preempt every state or local law so long as the first requirement is satisfied.  This strips the second limiting condition of any force whatsoever.

Id. at 146 (emphasis in original).  The panel majority also rejected a broad construction of the phrase "relates to" explaining that "if 'relates to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere."  Id. at 147 (internal quotation marks and alterations omitted) (quoting New York Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995)).

In McVeigh II, the Supreme Court affirmed the Circuit's holding that section 8902(m)(1) did not confer federal subject matter jurisdiction.  McVeigh II, 547 U.S. at 699.  Recently in Coventry, Justice Ginsburg confirmed that the holding of McVeigh II was limited to the "discrete question whether 28 U.S.C. § 1331 gives federal courts subject-matter jurisdiction over FEHBA reimbursement actions."  Coventry, 137 S.Ct. at 1198.  Because section 8902(m)(1) "is a choice-of-law prescription, not a jurisdiction-conferring prescription, . . . [the

McVeigh II Court] had no cause to consider § 8902(m)(1)'s text, context, and purpose." Id. (internal citations and quotation marks omitted) (noting that McVeigh II declined to decide whether the reimbursement claims at issue were preempted by section 8902(m)(1) because "the answer made no difference to the question there presented"). Therefore, the statements in McVeigh I regarding the scope of FEHBA preemption are dicta and do not control the Court's analysis here.

There is nothing in the text of section 8902(m)(1) that limits its application to state laws that specifically, explicitly or expressly relate to health insurance or plans. Although the Circuit cautioned against overly-broad interpretations of the phrase "relates to" in McVeigh I, in Coventry, the Court described that phrase as "expansive" and indicated that as used in the FEHBA preemption provision, the phrase "expresses a broad pre-emptive purpose." See Coventry, 137 S.Ct. at 1197 (internal quotation marks and alterations omitted). State laws of general application, including common law principles, can directly and significantly impact health insurance plans. The phrase "relates to health insurance or plans" limits the scope of preemption and prevents the provision from preempting *all* state laws which would be an absurd result. It does not, however, provide that state law is preempted only if it specifically references health insurance or plans.

Another clue that the state law at issue need not relate specifically to health insurance or plans comes from an understanding of the applicable principles of Missouri law that were held to be preempted in Coventry. At issue was Missouri's broad public policy related to subrogation principles as applied to personal injury claims. Nevils v. Grp. Health Plan, Inc., 418 S.W.3d 451, 453 (Mo. 2014), mandate recalled, opinion vacated (Aug. 14, 2015), cert. granted, judgment vacated sub nom. Coventry Health Care of Missouri, Inc. v. Nevils, 135 S.Ct. 2886

(2015) ("Missouri law generally prohibits subrogation in personal injury cases by barring insurers from obtaining reimbursement from the proceeds an insured obtains following a judgment against a tortfeasor."). The Missouri Court and the Supreme Court in Coventry found the conflicting Missouri law from a case that applied subrogation principles to an insurer's payment under a reservation of rights under a commercial liability insurance policy. See Nevils v. Grp. Health Plan, Inc., No. ED 98538, 2012 WL 6689542, at *2 (Mo. Ct. App. Dec. 26, 2012) and Coventry, 137 S.Ct. at 1195 (citing Benton House, LLC. v. Cook & Younts Ins., Inc., 249 S.W.3d 878, 881-82 (Mo. Ct. App. 2008)). "[H]ealth insurance or plans" had nothing in particular to do with the Missouri law principles that were preempted. 5 U.S.C. § 8902(m)(1).

Because the phrase "which relates to health insurance or plans" can fairly be viewed as ambiguous, the Court may consult legislative history to discern Congress's meaning. United States v. Gayle, 342 F.3d 89, 93–94 (2d Cir. 2003), as amended (Jan. 7, 2004). "Pre-emption fundamentally is a question of congressional intent," English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990), and one of Congress' stated goals for FEHBA and the preemption provision in particular, was to ensure the uniform administration of FEHBA benefit plans across the country. See S. Rep. No. 95-903, at 2 (1978) (purpose of preemption provision was to "establish uniformity in benefits and coverage"); H.R. Rep. 105-374, at 9 (1997) (purpose of a 1997 amendment to preemption clause was to "strengthen the ability of national plans to offer uniform benefits and rates to enrollees regardless of where they may live"). In a letter from OPM's predecessor, the Civil Service Commission, detailing the Commission's reasons for supporting enactment of FEHBA's original preemption provision, the Commission explained that one of the problems it had encountered while administering FEHBA plans was the existence of conflicting state laws governing the format and type of informational materials provided to

plan participants as well as the language to be used in those materials.  S. Rep. No. 95-903, at 7-8

(1978).  The Commission noted that without a preemption provision, the Commission and the

insurance carriers it contracted with would be forced to issue separate brochures in each state in

order to meet individual state requirements.  Id.  This history supports the conclusion that

FEHBA's preemption provision was intended to cover deceptive advertising claims like those

plaintiff brings here.

However, to be preempted, it is not sufficient that the state laws simply bear on

federal employee-benefits plans "in some way" or just "potentially bear[] on federal employee-

benefit plans in general . . . ."  McVeigh II, 547 U.S. at 698-99.  As applied here, New York and

New Jersey common law and consumer fraud statutes have a direct and significant impact on

FEHBA benefit plans and their administration in that they seek to regulate the disclosures made

about those plans.  These disclosures include the Plan Brochure which is distributed to all plan

participants across the country as specifically authorized by OPM.  See 2011 Plan Brochure at 1;

5 U.S.C. §§ 8902(d), 8907; 2008 Master Contract § 1.13(a); 2013 Master Contract § 1.13(a).

This impact is sufficient for FEHBA preemption.

In sum, the Court concludes that plaintiff's claims satisfy both prongs of

FEHBA's express preemption provision.  The FEHBA contract terms implicated by plaintiff's

claims "relate to the nature, provision, or extent of coverage or benefits (including payments with

respect to benefits)."  5 U.S.C. § 8902(m)(1).  In addition, after examining the text of the

preemption provision in light of recent Supreme Court analysis and the legislative history, and

considering the direct and substantial impact state law would have on FEHBA plans and their

administration, the Court concludes that the state common law principles and consumer

protection statutes invoked by plaintiff sufficiently "relate[] to health insurance or plans" to

trigger preemption.  Id.  Therefore, plaintiff's claims are expressly preempted and must be

dismissed.

      b.  Conflict Preemption.

      Alternatively, plaintiff's claims must be dismissed as conflict preempted.  "The

fact that an express definition of the pre-emptive reach of a statute 'implies'-*i.e.,* supports a

reasonable inference-that Congress did not intend to pre-empt other matters does not mean that

the express clause entirely forecloses any possibility of implied pre-emption."  Freightliner Corp.

v. Myrick, 514 U.S. 280, 288 (1995); Sprietsma, 537 U.S. at 65 (2002) ("Congress' inclusion of

an express pre-emption clause does *not* bar the ordinary working of conflict pre-emption

principles . . . .") (internal quotation marks omitted).  Here, defendant maintains that even if

plaintiff's claims do not fall under FEHBA's express preemption provision, they are implicitly

preempted because the state laws at issue "stand[] as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress" in passing FEHBA.  Freightliner

Corp., 514 U.S. at 287 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  "What is a

sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a

whole and identifying its purpose and intended effects . . . ."  Crosby, 530 U.S. at 372.

      Congress' stated goal in enacting FEHBA was to provide a comprehensive

program to provide federal employees with subsidized health benefits and medical care.  See

H.R. Rep. No. 86-957, at 1 (1959).  Congress also sought to ensure the uniform administration of

FEHBA health insurance plans and the benefits employees were offered under those plans.  See

Coventry, 137 S.Ct. at 1197 (noting that FEHBA involves "strong and distinctly federal interests

. . . in uniform administration of the program") (internal quotation marks and citations omitted);

Hayes v. Prudential Ins. Co. of America, 819 F.2d 921, 925 (9th Cir. 1987) ("The policy

underlying [FEHBA's express preemption provision] is to ensure uniformity in the administration of FEHBA benefits.") (citing H.R. Rep. No. 95-282, at 4 (1977)).  "To achieve these ends, Congress created [OPM], and vested it with the power to contract with private insurers on behalf of federal employees and to promulgate regulations to enforce the statutory scheme."  Botsford, 314 F.3d at 395.

As discussed, the legislative history reveals that FEHBA was designed to promote nationwide uniformity in health benefits but also uniformity in the information enrollees received about those benefits.  See S. Rep. No. 95-903, at 2, 7-8 (1978) (including letter from Civil Service Commission highlighting the difficulties complying with conflicting state laws governing the content and format of plan materials); H.R. Rep. 105-374, at 9 (1997).  Permitting plaintiff's misrepresentation claims to go forward and applying each state's individual common law and consumer protection statutes to defendant's statements and materials simply resurrects this problem.  Requiring that all Plan documents and advertising materials comply with 50 different state laws would frustrate Congress's goal of having FEHBA plans uniformly administered across the country.

Plaintiff alleges that she is a former citizen of New York and a present citizen of New Jersey.  (Compl. ¶ 2.)  She alleges that there are approximately 8.2 million enrollees in the Federal Employees Health Benefits Program and seeks to represent a nationwide class.  (Id. ¶¶ 35, 56.)  A glance at any map and common experience permits the inference that employees at a single federal employment site may reside in multiple states.  Federal workers employed by agencies, such as the Federal Emergency Management Agency, Immigration and Customs Enforcement, the U.S. Marshal Service, are often transferred temporarily or permanently to work locations in states other than the one where they first began their federal employment.  Implicit

in plaintiff's nationwide class allegations is an understanding that the FEHBA plans are available in each state where federal employees are present.

It is pure happenstance of diversity of citizenship that causes this action to be heard in a federal rather than state court. The amended complaint seeks an injunction against alleged unlawful practices. One state's law may point towards an injunction requiring disclosure that there are no lactation consultants in the area and another may offer a listing of all preferred providers as the solution. Yet another state's law may suggest that the defendant be enjoined from operating unless it promptly designated a number of lactation consultants in the area as preferred providers. The problem of applying the laws of multiple states becomes more accentuated when applied to equally plausible claims that a FEHBA plan did not disclose that there are no—or very few—preferred providers of other specialties, e.g. gastroenterology, oncology, in rural areas of a state. The variety of judicial solutions to such claims under state law could lead to a hodgepodge of disclosures or compelled added services. See, e.g., Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy, 6 Cal. Rptr. 2d 193 (Cal. Ct. App. 1992) (affirming trial court's affirmative injunction under California false advertising and unfair competition laws requiring defendant to include a warning on its products and in its advertisements); Honeywell, Inc. v. Control Sols., Inc., No. 3:94 cv 7358, 1994 WL 740883 (N.D. Ohio Sep. 7, 1994) (enjoining, pursuant to federal false advertising law and the Ohio Deceptive Trade Practices Act, use of allegedly false advertisements and requiring defendant to send a retraction letter to recipients of the advertisement). This inevitably increases the costs of compliance for the plan provider which are passed on to the federal government to the extent of its subsidy of employees' plans. In addition, this result undermines congressional intent by

"disrupt[ing] the nationally uniform administration of benefits which FEHBA provides."

Botsford, 314 F.3d at 395.

The existence of OPM's enforcement authority and the "distinctly federal" nature of the program also counsel in favor of a finding of preemption here. Coventry, 137 S.Ct. at 1197 (quoting McVeigh II, 547 U.S. at 696). Congress vested OPM with broad authority to regulate FEHBA health plans and it has promulgated regulations requiring that all FEHBA contracts include a provision prohibiting carriers from distributing marketing and informational materials that are untrue or misleading and allowing OPM to punish noncompliance. See 5 U.S.C. § 8913(a); 48 C.F.R. § 1652.203-70. In addition, OPM has authorized the distribution of the Plan Brochure for defendant's Service Benefit Plan, see 2011 Plan Brochure at 1, which, according to FEHBA, must include information OPM deems necessary and desirable, see 5 U.S.C. § 8902(d). This Plan Brochure is at the core of plaintiff's claims. It is the Plan Brochure that allegedly misrepresented the scope of defendant's preferred provider network and it is the Plan Brochure that allegedly misled insureds regarding the costs of visiting a lactation consultant. (See, e.g., Compl. ¶¶ 39-44.) OPM's enforcement authority and its involvement in the Plan Brochure, pursuant to FEHBA, provide further evidence of the uniquely federal nature of the Federal Employees Health Benefits Program and Congress' intent that OPM have responsibility for policing the content of Plan materials. Plaintiff's claims, which seek to apply state common law and consumer fraud statutes to the Plan Brochure and similar language repeated in other contexts, interfere with this intent.

Finally, the Court notes that if a plan participant is denied coverage for a service she believes she is entitled to under the Plan terms or the ACA, she may obtain services from an out-of-network provider and then submit a claim for reimbursement to the insurance carrier. See

5 C.F.R. § 890.105.  She may appeal any decision by the carrier to OPM and later to the district

court.  Id.; 5 C.F.R. § 890.107.  Thus, participants are not without a means to redress complaints

regarding the scope of their coverage and benefits.

Because the Court finds that the application of state law regarding deceptive trade

practices, fraud and misrepresentation would interfere with congressional intent and the purpose

of FEHBA, plaintiff's claims are conflict preempted.

CONCLUSION

Defendant's motion to dismiss (Dkt. 31) is GRANTED.  The Clerk is directed to

enter judgment for the defendant and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        September 22, 2017

- 22 -